UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

DEAN JEFFERY CHADWICK,      )
                            )
    Plaintiff,               )
                            )
    v.                       )        14-CV-3190
                            )
DR. HUGH LOCHARD, et al.,    )
                            )
    Defendants.              )

**OPINION**

**JOE BILLY MCDADE, U.S. District Judge.**

Plaintiff pursues an Eighth Amendment claim arising from an alleged delay in diagnosing and treating his fractured knee, which he injured when he slipped on ice while walking to the prison cafeteria in Lincoln Correctional Center on January 29, 2014.  After Defendants filed a motion for summary judgment, the Court recruited pro bono counsel for Plaintiff, and counsel has now filed a response to the summary judgment motion.

For the reasons explained below, summary judgment will be denied to Dr. Obaisi and Wexford Health Sources, Inc., and granted to Dr. Lochard and Nurse Claussen.[1]

---

[1] Defendant Carrie Claussen was incorrectly identified in the complaint as Carrie "Carlott."  According to the summary judgment motion, Defendant Claussen's prior last name was "Carlock" and current last name is Claussen.

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(B). If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. Id.; Harvey v. Town of Merrillville, 649 F.3d 526, 529 (7th Cir. 2011). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010). At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A

genuine dispute of material fact exists when a reasonable juror could find for the nonmovant.  Id.

## Facts

Plaintiff's claims arise from incidents which occurred during Plaintiff's incarceration in Lincoln Correctional Center in 2014, where Defendants Dr. Obaisi and Dr. Lochard were working on a "fill-in basis."  (Defs.' Undisp. Facts 3, 4.)  Plaintiff filed this case from prison but has since been released.

On January 29, 2014, Plaintiff slipped on ice and twisted his left leg while walking to the prison cafeteria.  He was able to finish his walk to the cafeteria but slipped a second time on his return from the cafeteria, this time twisting both legs.  He did not fall down either time and was able to walk back to his housing unit.  That night, he walked to and from dinner, but with pain—he "knew something was wrong."  (Pl.'s Dep. p. 35, d/e 41-1.)

On January 30, 2014, Plaintiff was having difficulty walking, and an officer called a "code."  (Pl.'s Dep. p. 36, d/e 41-1.)  Plaintiff was transported to the prison infirmary in a wheelchair.  The medical record from that date states that Plaintiff complained of an "inability to walk due to bilat[eral] foot wounds from boots."  The

record also states that Plaintiff complained of right heel pain and pain on the ball of his left foot. Two open wounds about ½ centimeter in diameter were noted on Plaintiff's lower legs. The record also states that Plaintiff walked from the nurses station to the infirmary with a "limping and unsteady gait" but had walked to the medicine line earlier with "only a slight limp." (1/30/14 medical progress notes, d/e 41-4, pp. 4-5). A note from later that date states that Plaintiff complained of "throbbing pain" to his right ankle and the ball of his left foot. Edema was noted in both of Plaintiff's legs, ankles, and feet, and both lower extremities were tender to the touch. Plaintiff was given Motrin and the medical record states that an "MD" ordered Plaintiff to be kept in the infirmary until seen by a doctor. (1/30/14 medical record, d/e 41-4, p. 4.)

The next morning (February 1) a nurse noted in the medical record that Plaintiff's gait was steady, and he had no edema or complaints. The record further notes that Plaintiff stated he did not want to be in the infirmary. A nurse note from a few hours later stated that Plaintiff reported he was fine but he needed different

footwear. Again Plaintiff was noted as walking with a steady gait. (2/1/14 medical record, d/e 41-17, p. 2.)

Later that day (February 1) Defendant Dr. Lochard examined Plaintiff. Dr. Lochard noted Plaintiff's bilateral lower leg ulcers from Plaintiff's boots. The medical record reflects that Plaintiff informed Dr. Lochard that one of Plaintiff's friends would give Plaintiff his gym shoes. Dr. Lochard prescribed Bactrim, ibuprofen, and antibiotic ointment. He also prescribed a low bunk and slow walk permit. (2/1/14 medical record, d/e 41-8, p.2.) Dr. Lochard discharged Plaintiff from the infirmary that day and instructed that a follow up be scheduled for February 12. Plaintiff returned to his housing unit.

Dr. Lochard avers that at no point did Plaintiff complain of knee pain during the February 1 visit. (Dr. Lochard Aff. para. 6.) Plaintiff disputes this but his cites to the record do not support an inference that Plaintiff complained of knee pain on February 1 or before that date. However, Plaintiff did testify in his deposition that Dr. Lochard asked Plaintiff to walk and told Plaintiff that "it's probably just a severe sprain and you need to walk and exercise." (Pl.'s Dep. p. 39.)

On February 3, 2014, two days after Dr. Lochard discharged Plaintiff from the infirmary, Plaintiff was readmitted to the infirmary because he could not put weight on his legs. The nurse noted "right leg +3 pitting edema" and left heel pain. Dr. Funk, who is not a defendant, was notified. (2/3/14 medical record, d/e 41-10, p. 1.)[2] Over the next two days Plaintiff stated he was unable to walk and complained of left knee pain, left heel and foot pain, and right heel pain. (2/4/14-2/5/14 medical records, d/e 41-18, pp. 2-5.) On February 5, 2014, Plaintiff complained that he could not put weight on his left knee and that he needed a wheelchair. The nurse noted that Plaintiff's right and left legs and feet were swollen. (1/5/14 medical record, d/e 41-18, pp. 6-9). The nurse note from February 7, 2014 states that Plaintiff was ambulating slowly and full weight bearing. (1/7/14 medical record, d/e 41-19, p. 4.)

Dr. Obaisi examined Plaintiff on February 7, 2014. Plaintiff told Dr. Obaisi that he was having difficulty walking and complained of left knee and right heel pain. Dr. Obaisi found Plaintiff's left knee to be warm with mild tenderness and his right knee to have mild swelling. Dr. Obaisi also noted two tender

---

[2] The Court believes that Dr. Funk was the Medical Director at Lincoln Correctional Center based on Plaintiff's description of Dr. Funk's job. (Pl.'s Dep. p. 53.)

varicose veins in both lower legs. Dr. Obaisi's assessment was possible bursitis in Plaintiff's left knee, tendonitis bursitis of the right heel and varicose veins. Dr. Obaisi ordered x-rays of Plaintiff's left knee and right ankle and also ordered a uric acid test to check for gout, as well as a comprehensive metabolic panel lab draw. (2/7/14 medical record, d/e 41-19, p. 6.) Dr. Obaisi prescribed a walker, two lidocaine injections, an anti-inflammatory, and ice.

Plaintiff remained in the infirmary, using the walker to ambulate but walking slowly until February 12, 2016, when Dr. Lochard discharged Plaintiff from the infirmary. On that date, Dr. Lochard diagnosed Plaintiff with chronic musculoskeletal pain, pending the x-ray results, and ordered Plaintiff to use the walker indefinitely. Defendants maintain that the walker allowed Plaintiff to put little to no weight on his leg, but Plaintiff counters that he was instructed to keep putting weight on his left leg throughout this entire period. (Pl.'s Compl. p. 9)("I told [Dr. Lochard something was really wrong for I can hardly walk [and] he told me to use the walker and walk it off.")

X-rays of Plaintiff's left knee were taken on February 13, 2014. The x-rays showed that Plaintiff had an "acute proximal medial

tibial plateau fracture." (Dr. Olysav 5/22/14 report, d/e 41-25.)

The x-ray report stated that the joint space was maintained:

> A fracture is noted involving the medial tibial plateau and proximal tibia. The fracture abuts the articular surface along the tibial tuberosities. The joint space is maintained. No joint effusions are present. Mild soft tissue swelling is noted.

(2/13/14 x-ray report, d/e 41-25, p. 5.)[3]

Dr. Obaisi reviewed the x-ray report the next day (February 14) and ordered that Plaintiff be admitted to the prison infirmary. Dr. Obaisi also began the process for seeking a "collegial review" through Wexford Health Sources, Inc., in order to obtain an orthopedic referral. (2/14/14 medical record, d/e 41-20, p. 2, 4.) Dr. Obaisi directed that Plaintiff could engage in activity as tolerated, and Plaintiff was directed to continue using the walker to ambulate. (2/14/14 medical record, d/e 41-20, p. 5). Dr. Obaisi saw Plaintiff the next day (February 15), prescribing pain medicine and a knee brace. February 15th was the last time Dr. Obaisi saw Plaintiff

---

[3] The website for the American Academy of Orthopaedic Surgeons states with regard to proximal tibia fractures and weight bearing: "Whether your fracture is treated with surgery or not, your doctor will most likely discourage full weight bearing until some healing has occurred. This may require as much as 3 months or more of healing before full weight bearing can be done safely. During this time, you will need crutches or a walker to move around. You may also wear a knee brace for support." http://orthoinfo.aaos.org (last visited 7/12/16).

before Plaintiff's consult with Dr. Olysav, an orthopedic surgeon, on March 3, 2014.

Dr. Obaisi avers that he did not encourage Plaintiff to walk on his left leg after the x-ray, but Plaintiff disputes this. Plaintiff testified in his deposition that Dr. Obaisi was one of the "circle of doctors" who treated Plaintiff both before and after the x-ray like Plaintiff just had a "bad sprain" and needed to "walk it off."  He testified that he was instructed to ambulate even after the x-ray.  (Pl.'s Dep. pp. 44, 52, 55, 59.)  The nurses also told Plaintiff to make sure he ambulated.  (Pl.'s Dep. 41-1, p. 51.)

Dr. Lochard saw Plaintiff on February 26, 2014, the first time Dr. Lochard had seen Plaintiff after the x-ray results. According to Plaintiff, Dr. Lochard apologized and said that he never thought anything was broken.  (Pl.'s Dep. p. 56.)  Dr. Lochard ordered a neoprene brace, crutches, and no weight bearing.  (1/26/2014 medical record, d/e 41-23, p. 2.) Plaintiff maintains that, despite Dr. Lochard's orders, he never received the crutches or the brace and he was not provided any way to avoid bearing weight on his left leg.

On March 3, 2014, Plaintiff saw Dr. Olysav, an orthopedic surgeon. Dr. Olysav's report states that Plaintiff presented as "full weight bearing with his walker." Dr. Olysav's report goes on to state:

> Since films that are given to us are on a CD, they are reviewed and dated February 13, 2014, show an acute-appearing proximal tibial medial plateau fracture; however, patient has been full weight bearing. Therefore, x-rays are repeated and there is significant collapse of the entire medial plateau, widening of the intercondylar notch of the tibia. This is now a displaced and angulated tibia apparent[ly] due to the patient's full weight bearing. I do not know what restrictions were placed on the patient initially after injury or after the diagnosis made with this x-ray.
>
> He will, in order to prevent this from further varus and nearly the impossibility of recreating the joint space even with total knee arthroplasty because of the displacement, our plans will be open reduction internal fixation of the medial tibial plateau with bone graft. If this is, as the patient indicates, the injury date of January 30, 1st x-ray February 13, 1st evaluation March 3, this would then require an osteotomy of the proximal medial tibia, opening wedge, and then bone grafting with application then of a plate and screws to maintain that position. He would then be nonweightbearing postop. I will put him in a cylinder case postoperatively.
>
> Information is conveyed to the institution, correctional center, and our response is that the patent will be seen for a history and physical later on today so that surgery could be done tomorrow, that is March 4, 2014, as an outpatient.

(Dr. Olysav March 2014 Report, d/e 41-25, p. 4.)  Dr. Olysav ordered that Plaintiff not bear weight.  (3/3/14 medical record, d/e 41-24, p. 1.)  Plaintiff could not receive the surgery the next day because, according to Plaintiff, Plaintiff's blood tests showed a low platelet count.  (Compl. p. 1.)  He eventually had the surgery on July 8, 2014.  (Dr. Olysav July 2014 report, d/e 18, pp. 3-4; Pl. Dep. p. 45.)

## Analysis

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment.  <u>Gomez v. Randle</u>, 680 F.3d 859, 865 (7th Cir. 2012).  Defendants do not dispute that Plaintiff's injury was serious—Plaintiff fractured his knee and was experiencing severe pain and difficulty walking.

The question is whether a rational jury could find that Defendants were deliberately indifferent to that injury.  Deliberate indifference is more than malpractice.  Deliberate indifference is the conscious disregard of an excessive risk to an inmate's health.  <u>Arnett v. Webster</u>, 658 F.3d 742, 751 (7th Cir. 2011).  Deliberate indifference arises when a doctor's decisions are a "'such a

substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" Sain v. Wood, 512 F.3d 886, 894-95 (7th Cir. 2009)(quoted cite omitted). Malpractice is not deliberate indifference, and there is no malpractice claim before the Court. Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006)("even admitted medical malpractice does not give rise to a constitutional violation.").

### Dr. Obaisi

There is no medical evidence in the record for a reasonable jury to find that on February 7th, the first time Dr. Obaisi saw Plaintiff, the existence of a fractured knee was obvious and should have been diagnosed prior to the knee x-ray results on February 14th. Dr. Obaisi's notes from February 7th reflect that he suspected bursitis in Plaintiff's left knee. Dr. Obaisi also ordered an x-ray on this date, but that order suggests only that Dr. Obaisi was ruling out a possible fracture, not that a fracture was obvious. Plaintiff offers no evidence that Dr. Obaisi's treatment decisions on February 7th were a substantial departure from accepted professional norms.

However, a jury could reasonably find that Dr. Obaisi was deliberately indifferent after he reviewed the x-ray results on July 14th. Dr. Obaisi does not explain why it took over two weeks from the x-ray results to schedule Plaintiff for a consultation when Dr. Obaisi knew by that time that Plaintiff had a fracture and had likely been living with the fracture since January 30, 2014, when Plaintiff was first admitted to the infirmary. Additionally, if Plaintiff's version is believed, Dr. Obaisi continued to instruct Plaintiff to bear full weight on his left leg by prescribing a walker even after receiving the x-ray results. Even a layperson can conclude from the first x-ray and Dr. Olysav's report that Plaintiff's weight bearing after July 14 caused significant damage to Plaintiff's knee. In the first x-ray, the joint space is maintained. Two ½ weeks later, Plaintiff's "entire medial plateau" had collapsed and Dr. Olysav reported that "recreating" the joint space might be impossible. (Dr. Olysav's May 2014 report.) Dr. Olysav's decision to schedule surgery the day after seeing Plaintiff suggests that time was of the essence.

Dr. Obaisi has evidence in his favor, but that evidence only demonstrates that a disputed question of fact exists for the jury to

decide.  For example, the medical records do not appear to reflect that Plaintiff ever told the medical professionals that he twisted his knees.  Plaintiff's complaints at the beginning focused on his boots and feet.  Plaintiff was having swelling and problems with both legs, not just one, and he appeared to have other medical conditions that may have complicated the diagnosis.  Plaintiff himself reported that he "did not know what he did" to cause his difficulty walking (2/4/14 nurse note, d/e 41-18, p. 2), and told the nurse on February 1 that he was fine except for the boots.  A rational juror could find Dr. Obaisi was trying in good faith to find the cause of Plaintiff's problems and that he simply failed to appreciate the extent of Plaintiff's injury even after seeing the x-ray.

### Dr. Lochard

This record would not support a jury verdict against Dr. Lochard.  When Dr. Lochard saw Plaintiff on February 1, Plaintiff's complaints were focused on Plaintiff's boots and lower leg ulcers.  Plaintiff's edema had improved by the time he saw Dr. Lochard, and earlier that day Plaintiff had said he was fine and did not want to be in the infirmary.  As soon as Dr. Lochard became aware of the x-ray results, Dr. Lochard ordered crutches and no weight bearing.

Plaintiff asserts that he never received the crutches, but he offers no evidence that Dr. Lochard knew this.

Dr. Lochard did release Plaintiff from the infirmary on February 12 with the walker, despite knowing that x-rays had been ordered. However, Plaintiff points to nothing in the record to suggest that this treatment plan was inappropriate while awaiting the x-ray results or that keeping Plaintiff in the infirmary was medically required. The record is void of any medical evidence that the existence of the fractured knee was obvious and should have been diagnosed prior to the x-ray results on February 14th.

## Nurse Claussen

A jury also could not reasonably find against Nurse Claussen on this record. Nurse Claussen was the Director of Nursing at Lincoln Correctional Center, responsible for supervising the nursing staff. Nurse Claussen avers that she rarely provides direct medical care to patients and directs the nurses to follow the doctor's orders. According to Plaintiff, Dr. Obaisi and Dr. Lochard told Plaintiff to ambulate, so an inference arises that Nurse Claussen would have echoed that direction.

Nurses cannot blindly follow doctors' directions if doing so amounts to ignoring obvious risks.  Perez v. Fenoglio, 792 F.3d 768, 779 (7th Cir. 2015)("While nurses may generally defer to instructions given by physicians, they have an independent duty to ensure that inmates receive  constitutionally adequate care.")(*citing* Berry v. Peterman, 604 F.3d 435, 443 (7th Cir. 2010) and Rice ex rel Rice v. Correctional Med. Servs., 675 F.3d 650, 682 (7th Cir. 2012).  However, there is no medical evidence in this record that Nurse Claussen knew about and ignored any obvious risk by following the doctors' orders.  Before the knee x-ray on July 14th, the cause of Plaintiff's knee problem was not obvious even to the doctors.  Further, Plaintiff offers no evidence that Nurse Claussen knew that Dr. Obaisi's instructions after the x-ray were blatantly inappropriate.  Plaintiff also points to no evidence that Nurse Claussen was aware that Plaintiff did not receive his crutches as directed by Dr. Lochard.  In sum, Plaintiff has not pointed to any admissible evidence which would support a jury verdict against Nurse Claussen.

## Wexford Health Sources, Inc.

Wexford Health Sources, Inc. (Wexford) cannot be held liable unless an unconstitutional policy or practice of Wexford caused the constitutional deprivation, or a final policymaker at Wexford caused the constitutional deprivation. Perez v. Fenoglio, 792 F.3d 768, 780 (7th Cir. 2015); Awalt v. Marketti, 74 F.Supp.3d 909, 933 (N.D. Ill. 2014).

Wexford argues that Plaintiff offers no evidence that a policy or practice of Wexford caused the alleged deliberate indifference by Defendants, who are Wexford employees. Plaintiff counters that a "widespread unwritten practice" can be inferred that Wexford "condoned ignoring Mr. Chadwick's medical requests."

Plaintiff has not offered any evidence that Wexford had any unwritten practice of condoning or turning a blind eye to deliberate indifference by their employees. However, the record is silent on why the consultation took 2 ½ weeks after the x-ray. Dr. Obaisi seems to imply that he was trying to obtain approval from Wexford in a "collegial review" during this time. The record is silent on Wexford's procedure for obtaining approval for an outside consult where an x-ray shows a fracture. What is required and how long

does it take? Did a final policymaker from Wexford cause the delay? This evidence is critical because the time between the x-ray and the consult is arguably the time when Plaintiff experienced the most damage to his knee. Summary judgment might be warranted on a more developed factual record, but Wexford's present motion does not meet its burden on summary judgment.

## Qualified Immunity

Defendants assert qualified immunity, but they do not address cases which suggest that whether they can claim qualified immunity does not appear to be settled in this Circuit. *See* Maldonado v. Powers, Wexford, et al., 2014 WL 2926522 * (S.D. Ill. 2014)(report and recommending concluding that qualified immunity not available to Wexford prison doctor)(*citing* Currie v. Chhabra, 728 F.3d 626, 632 (7th Cir. 2013) (not deciding question but finding persuasive Sixth Circuit's denial of qualified immunity to doctors providing psychiatric services to prisoners.) In any event, Defendants' qualified immunity argument depends on accepting their version of the facts and drawing inferences in their favor, which the Court cannot do at the summary judgment stage.

**IT IS THEREFORE ORDERED:**

1) The clerk is directed to correct the docket to reflect that Defendant "Carlott's" correct last name is Claussen.

2) Defendants' motion for summary judgment is granted in part and denied in part (41). Summary judgment is granted to Defendants Lochard and Claussen. Summary judgment is denied to Defendants Obaisi and Wexford Health Sources, Inc.

3) This case is referred to Magistrate Judge Hawley for a settlement conference. The final pretrial and trial will be scheduled if no settlement can be reached.

4) The clerk is directed to notify Magistrate Judge Hawley of the referral of this case to him for a settlement conference.

ENTERED: 8/1/16

FOR THE COURT:

                                  **s/Joe Billy McDade**
                                  JOE BILLY MCDADE
                                  UNITED STATES DISTRICT JUDGE